*1008 OPINION OF THE COURT
Philip C. Segal, J.
In this juvenile delinquency proceeding, respondent, Tristan C., a 10-year-old child, is charged with manslaughter in the second degree, criminally negligent homicide, criminal possession of a weapon in the fourth degree, and related lesser included offenses. The incident leading to these charges occurred when Tristan, then nine years old, accidently shot and killed his best friend and cousin, Shamel S., a 12-year-old boy, with whom he resided. Tristan’s Law Guardian now moves, prior to the fact-finding hearing, to dismiss the petition in the furtherance of justice (Family Ct Act § 315.2). For the reasons set forth below, the motion is granted.
I
Prior to this incident in September 1992, Tristan resided in the home of his paternal grandmother, Lucy K. Also residing in the home were a paternal aunt, Sondra S., her two children, Shamel, who as noted was age 12, and Mahari, age eight, and an unrelated individual named Bunny, who is described both as a boarder and as Sondra’s former boyfriend. Tristan’s father abandoned him almost seven years ago, and is reportedly in prison in Jamaica, West Indies. Tristan’s mother, Carol W., has been incarcerated in a New York State prison since 1989 as a result of a conviction for cocaine possession. She is presently in a work release program in New York City, which has enabled her to maintain a close relationship with her son.
The critical event in this case is a tragic accident which occurred on September 26, 1992, the account of which is largely undisputed. On that date, Tristan and Shamel returned home from a movie with Shamel’s mother. Shamel told Tristan to come into Bunny’s room where they could, and did, play Nintendo. At some point, Shamel showed Tristan two guns that were hidden under Bunny’s mattress; Shamel gave one of the guns to Tristan. Both boys thought that the gun was not loaded. Shamel told Tristan, "Make believe you’re shooting me.” Tristan then aimed the gun at Shamel, pulled the trigger and shot him in the head at close range. Shamel died instantly. Early in the morning of September 27, 1992, Tristan gave a statement to the police in which he detailed the above and admitted his involvement. The present proceeding ensued.
*1009 The impact of Shamel’s death on Tristan has been nothing less than devastating. He suffers from extreme guilt, suicidal thoughts, flashbacks and constant nightmares. A psychiatrist who evaluated Tristan in December 1992, diagnosed him with posttraumatic stress disorder and depressive disorder, not otherwise specified.
In addition, Shamel’s death has caused great division in the family. Shamel’s mother blames Tristan; indeed, she verbally harassed and blamed the child so that Tristan’s mother determined that he had to be moved. His mother temporarily arranged for Tristan’s care by another relative. On one occasion while this case was pending, Shamel’s mother appeared in the Family Court waiting room and repeatedly shouted "murderer” at Tristan.
As stated, Tristan recently was psychiatrically evaluated. That evaluation was part of an extensive multidisciplinary diagnostic assessment ordered by the court to be conducted at the Pleasantville Diagnostic Center, a facility operated by the Jewish Child Care Association of New York. The final conclusion of that evaluation is that "Tristan is in immediate need of long term therapeutic placement * * * skilled in treating younger children. He requires a safe, nurturing, supportive and neutral environment” where he can be treated and "begin to heal from the severely damaging, traumatic series of experiences” Tristan has endured.
Based on this recommendation, Tristan’s mother attempted to secure such a placement through the New York City Department of Social Services. However, because of the pending juvenile delinquency proceeding, that agency refused to accept a voluntary transfer of custody (Social Services Law § 384-a). Thereafter, on January 28, 1993, the court formally placed Tristan at Green Chimneys on a PINS petition (Family Ct Act art 7), which had been filed by Tristan’s mother for that purpose.
Although Shamel’s death and its aftermath has had an enormously damaging impact on Tristan, there is also evidence that the present juvenile delinquency proceeding by itself has aggravated his psychological trauma and could well impede his recovery. According to a clinical psychologist who evaluated Tristan, continued Family Court proceedings focused on the events surrounding Shamel’s death "would exacerbate his depression and increase the likelihood of suicidal acting out behavior. It would further damage his weak sense *1010 of self-esteem, contributing to his highly negative self-image and deepening his sense of psychological withdrawal. The proceedings would most likely interfere with any progress Tristan has (already) made.” Tristan’s Law Guardian maintains in this motion that the damaging impact of this proceeding in and of itself constitutes sufficient basis for the dismissal he now seeks.
II
The Family Court’s discretionary authority to dismiss a juvenile delinquency proceeding in the furtherance of justice is rarely invoked. Such action must follow consideration of identified statutory criteria,[1] and is limited to the " 'rare’ and 'unusual’ case where it 'cries out for fundamental justice beyond the confines of conventional considerations.’ ” (People v Harmon, 181 AD2d 34, 36 [1st Dept 1992]; see also, People v Bebee, 175 AD2d 250 [2d Dept 1991]; Matter of Carlief V., 121 AD2d 640 [2d Dept 1986]; People v Belkota, 50 AD2d 118 [4th Dept 1975].) In the present case, the court concludes that such "rare” and "unusual” circumstances exist, and that the continuation of this proceeding against Tristan would work a substantial injustice.
Nothing in this decision is intended to diminish the tragedy of Shamel’s death and the profound loss his family has suffered. Nonetheless and even assuming that Tristan could be found to have engaged in delinquent behavior,[2] the court’s primary goals are to facilitate Tristan’s rehabilitation and to *1011 safeguard the community’s need for protection. (Family Ct Act § 301.1.) Unlike the criminal prosecution of adults, neither retribution nor punishment is a legitimate premise for the court’s disposition. (Matter of Carmelo E., 57 NY2d 431, 435 [1982]; see, In re Gault, 387 US 1, 14-17 [1967].)
Here, the evidence before the court establishes that Tristan would be damaged by having to participate in a fact-finding and then a dispositional hearing. Indeed, the evidence supports a conclusion that Tristan’s rehabilitation may be more likely if he is not subjected to additional protracted proceedings. Moreover, there is no reason to believe that additional relevant information as to Tristan would be received. The court already has an extensive diagnostic assessment; Tristan’s needs have been identified; and he is now receiving the intensive residential treatment he requires. (Compare, Matter of Kwane M., 121 AD2d 635 [2d Dept 1986].) Accordingly, the court finds that Tristan’s best interests would not be promoted by a continuation of this proceeding.
Finally, it cannot be argued that Tristan is — or ever was — a danger to the community. Nothing in the reports already presented shows that he had any prior involvement with the law, or that he has a propensity toward violence or delinquent behavior. (Matter of Kwane M., supra.)
In view of the foregoing, the motion to dismiss the proceeding in furtherance of justice is granted.

. The statute requires that the court consider, to the extent applicable, any one or more of the following: the seriousness and circumstances of the crime; the extent of harm caused by the crime; any exceptionally serious misconduct of law enforcement personnel in the investigation and arrest of the respondent or in the presentment of the petition; the history, character and condition of the respondent; the need for protection of the community; or any other relevant fact indicating that a finding would serve no useful purpose. (Family Ct Act § 315.2 [1]; see, People v Rickert, 58 NY2d 122 [1983].)

. With the exception of two weapon possession counts, Tristan is not charged with crimes that require any criminal intent. The claims that his recklessness and/or criminal negligence caused Shamel’s death may be difficult to prove as to a nine year old. In addition, Tristan’s statement to the police (which the presentment agency intends to offer at trial) was made after a station house interrogation at 3:00 a.m., many hours after Shamel was shot. These circumstances properly may raise questions as to whether Tristan understood his rights, the validity of his waiver, and the voluntariness of his statement. (See, e.g., Matter of Julian B., 125 AD2d 666 [2d Dept 1986].)